```
                    LODGED
              CLERK, U.S. DISTRICT COURT
                   10/29/25
         CENTRAL DISTRICT OF CALIFORNIA
         BY:        MTV        DEPUTY
```

1  BILAL A. ESSAYLI
   First Assistant United States Attorney
2  IAN V. YANNIELLO
   Assistant United States Attorney
3  Chief, National Security Division
   JOHN J. LULEJIAN (Cal. Bar No. 186783)
4  Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
7       E-mail:    John.Lulejian@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA



```
            FILED
   CLERK, U.S. DISTRICT COURT
        10/29/2025
   CENTRAL DISTRICT OF CALIFORNIA
   BY:      clee        DEPUTY
```

ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>MEDHAT MOURID,<br><br>A Fugitive from the Government of the Federal Republic of Germany. | No. 2:25-mj-06754-DUTY<br><br>COMPLAINT<br><br>FOR PROVISIONAL ARREST WITH A VIEW TOWARD EXTRADITION (18 U.S.C. § 3184); ORDER THEREON<br><br>**(UNDER SEAL)** |

TO: Honorable Steve Kim
    United States Magistrate Judge
    Central District of California

I, JOHN J. LULEJIAN, being duly sworn, depose and state that I am an Assistant United States Attorney for the Central District of California and act for the United States in fulfilling its obligations to the Government of the Federal Republic of Germany ("Germany") pursuant to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20, 1978, T.I.A.S. No. 9785, as amended by the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987),

as amended by the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty").

In accordance with Title 18, United States Code, Section 3184, I charge on information and belief as follows:

1. That the Government of Germany has requested the provisional arrest of the fugitive, MEDHAT MOURID ("MOURID" or the "fugitive"), pending extradition, pursuant to Article 16 of the Extradition Treaty, as amended by Article 3 and Article 4 of the Second Supplementary Treaty.

2. That according to the information provided by the Government of Germany, MOURID is wanted by Germany so that he may be prosecuted for Formation of a Criminal Organization Abroad, in violation of Section 129 paras. 1, 5 and 129b para. 1 of the German Criminal Code.[1]

3. That on or about May 13, 2025, the Koblenz District Court, which is authorized by German law to issue warrants of arrest, issued a warrant for MOURID's arrest for this offense. The warrant remains valid and enforceable.

4. That the offense for which the fugitive's extradition is sought is covered by Article 2 of the Extradition Treaty.

5. That German authorities allege that Germany has jurisdiction over the offense MOURID is accused of having committed.

---

[1] The United States is seeking a warrant for MOURID's provisional arrest based only on this charge, but doing so is without prejudice to proceeding on additional charges when Germany's formal request for extradition has been reviewed by the Department of State and is presented to the Court.

6. That Germany's request contains information that was developed during an extensive international investigation that resulted in evidence in the form of banking and financial records, business records, witness and victim statements, e-mail communications, text messages via the messaging services WhatsApp and Telegram, and other records. Germany's case is also based on evidence developed during the 2020 prosecutions of the late Hamid "Ray" Akhavan ("R. Akhavan") and Ruben Weigand ("Weigand"), a current co-defendant, for similar criminal conduct in the United States District Court for the Southern District of New York, 1:20-cr-00188-JBR (S.D.N.Y. 2020),[2] including the results of searches of two mobile telephones and a laptop. Germany presents the following facts, among others, related to the above offense in support of its request for the provisional arrest of MOURID:

a. Germany is prosecuting a global criminal organization, which through separate but related networks, falsified subscriptions to online "services" that were not provided, fraudulently charged debit and credit cards for those nonexistent services through German payment service providers, and distributed the wrongly charged money to the participants in the global criminal organization. One of the networks, WebOps, created shell companies that purportedly operated fictitious pornographic Internet websites and fraudulently registered those companies with German payment service providers to facilitate

---

[2] See https://www.justice.gov/usao-sdny/pr/two-architects-fraudulent-scheme-sentenced-processing-over-150-million-through-us (R. Akhavan and Weigand sentenced following conviction of "scheme to deceive U.S. issuing banks and credit unions into effectuating more than $150 million of credit and debit card purchases of marijuana by disguising those transactions as purchases of other kinds of goods, such as face creams and dog products.")

3

financial transactions between unsuspecting victims and the criminal organization. Between or about March 2016 and July 2021, the WebOps network included the now-deceased R. Akhavan and the following individuals believed to be residing in the United States:

    i.    ARDESHIR SEYED AKHAVAN ("A. AKHAVAN");

    ii.    TUNDE BENAK ("BENAK")

    iii.    KATIUSKA CRUZ ("CRUZ");

    iv.    GUY MIZRACHI ("MIZRACHI"); and

    v.    MOURID (collectively the "WebOps Members").

Other members of the WebOps network reside outside of the United States. The role of each of these individuals in WebOps is described below.

### Overview of Criminal Conduct

b.    Germany alleges that the WebOps Members and other participants in the criminal organization (collectively "the network" or "the organization") deceived German banks into processing more than € 195 million, and attempted to deceive German banks into processing more than € 660 million in credit and debit card payments for the purchase of "services" that the cardholders did not order and for which they often were unaware they were being charged. The charges the customers faced were disguised as payments to phony online merchants, including transactions that appeared to be for pornographic and adult entertainment sites. In furtherance of the scheme, the network created fictitious offshore corporations that operated fake adult entertainment websites. The network then worked with third-party payment service providers (the "German payment service providers") to onboard those corporations with the providers, thus allowing the companies to process debit and credit transactions

through their websites. The network convinced German payment service providers to honor fictitious charges that appeared to be legitimate charges for services rendered.

  c. German authorities determined that between or about March 2016 and July 2021, over 9.6 million subscriptions were improperly charged via the WebOps network:

    i. The network improperly charged victims' credit cards in almost 2 million transactions, thereby causing financial damage of over € 195 million.

    ii. In an additional 7.7 million instances, the WebOps network submitted fictitious subscriptions to the German payment service providers that did not result in charges to credit cards because the data used was either outdated or incorrect or the credit card limit was exhausted. These attempted transactions would have yielded over € 660 million had they been successful.

### Summary of the WebOps Scheme

  d. German authorities determined that the WebOps scheme to defraud consisted of the following components:

    i. <u>First</u>, the WebOps network used phishing and other methods to obtain credit card information to charge for subscriptions to adult entertainment and pornographic websites. Specifically, the WebOps network appropriated credit card information and data from large phishing attacks in which cardholders clicked on banner ads, downloaded Internet games, or registered for sweepstakes and potential fake shops. The WebOps network also purchased card data on the Darknet and from leaks following ransomware attacks, where hackers published or auctioned the stolen files on the Darknet.

ii. **Second**, the WebOps network used shell companies disguised as legitimate merchants. The WebOps network was a part of a complex group-like corporate structure consisting of many letterbox companies in the United Kingdom, Cyprus, Luxembourg, Canada and the United States[3], through which approximately 486 front companies operated at least 1,066 Internet pages. To appear legitimate, each fictious merchant ran five to seven webpages suggesting that they were involved in selling legitimate adult entertainment services. However, these front companies were used to facilitate the processing of charges for which no services were ever provided.[4] The scheme even involved fake traffic to those websites to make it appear to payment providers and financial institutions that the websites had real customers and were operating legitimate online businesses. These websites could not be found using ordinary search engine such as "Google" or "Bing." Further, the pornographic content pages of many of the websites were almost identical in terms of their design and menu navigation.

iii. **Third**, the issuing banks allowed the fictitious merchants to set up accounts to process credit and debit card

---

[3] An investigation of the fictitious merchants and their headquarters revealed that they had been set up in groups and that their business addresses often led to single-family homes or referred to purely virtual offices. An audit of a German payment service provider revealed that that managers of these fictitious merchants were already at retirement age and could not describe the business model or the financial background of the companies purportedly managed by them, underscoring that these managers were not actually managing anything at the merchants.

[4] Quantum Solutions, Inc. ("Quantum"), a company with a business address in Calabasas, California, was the company through which the shell company documentation was submitted to payment service providers. According to its website, the company's business activities included, among others, programming, internet traffic and hosting. The operators of the WebOps network operated under Quantum's corporate mantle.

transactions. After creating the fictitious merchant companies, the WebOps network established Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks. Despite being based outside of Germany, many of the fictitious merchants purported to maintained Germany-based customer service numbers, which lent them legitimacy.

    iv. Fourth, relying on the issuing banks and documents submitted by the phony merchants, German payment service providers agreed to accepted credit card charges for the merchants. The WebOps network would ensure that the merchants and their websites were accepted as customers by the German payment service providers and were onboarded for the settlement of credit card transactions. Once the German payment service providers accepted the fictitious merchants as customers, members of the network could collect the unauthorized debits, in part by maintaining close contacts with high-ranking employees of the German payment service providers.

   e. Fifth, fictitious merchants charged victims' credit cards, mostly Visas and MasterCards. Witnesses told German authorities that their credit card data were improperly used to subscribe to the use of pornographic material on the above websites without the cardholders having used a service. As a result, presumed monthly subscriptions of up to € 50 were billed via these credit cards, often over several years. In many cases, the victims did not notice that they had been harmed, as their credit card statements contained only cryptic descriptors and did not reference the corresponding websites.

   f. Sixth, credit card payments were funneled back to the WebOps network, thereby laundering the proceeds of the credit and

debit card fraud. All of the funds were funneled to Five Lions Holding Société à responsabilité limitée ("Five Lions Holding"), which, according to Luxembourg authorities, was a letterbox business in that nation that did not conduct economic activity. The German investigation determined that WebOps was the "master merchant"-the "operating arm" of Five Lions Holding. As detailed below, between or about March 2016 and July 2021, A. AKHAVAN and MIZRACHI operated WebOps from the United States.

### Structure of the WebOps Network

g.  The network is similar to an internationally active corporation. The WebOps network built up a complex company structure and a supposed franchise system called "CE Cash" under the leadership of the late R. Akhavan, GUY MIZRACHI, and A. AKHAVAN. In the WebOps network, the franchisees were the fictitious merchants, and the franchisors were the leaders of the network. However, the CE Cash franchise system was a façade.

h.  According to the notes of an employee of a German payment service provider, in or about August 2018, R. Akhavan stated during a personal meeting in Vienna, Austria, with an employee of German payment processor Wirecard Aktiengesellschaft ("Wirecard"), that he was behind CE Cash. He described CE Cash as a group of companies specialized in adult entertainment which, as franchisors, offered licenses to companies in the adult entertainment industry. CE Cash offered its customers-the franchisees-package solutions such as web hosting, software, traffic processing, and customer support. The franchisee paid 90 percent of its total turnover to the licensor CE Cash, a practice that departed completely from the classic and widespread franchise model, in which franchisees are economically

independent. Under the terms of the contract, the fictitious merchants received only a fixed € 5,000 per annum, an amount far removed from their own revenue. Instead, the entire revenue generated by the fictitious merchants went to "the network managers"- the WebOps Members and other members of the network.

i.  The German investigation also revealed that the fictitious merchants' content design and orientation of the Internet pages were not carried out by the merchants. The fictitious merchants also did not obtain their URLs. Instead, these tasks were handled by the WebOps Members.

### The WebOps Members and Their Roles

j.  <u>R. Akhavan</u>: Prior to his arrest in March 2020, R. Akhavan operated the WebOps network and determined its illegal design in commercial transactions.

k.  <u>MIZRACHI</u>: Between or about 2016 and 2020, MIZRACHI was R. Akhavans' right-hand lieutenant. Following R. Akhavan's arrest, MIZRACHI ran the WebOps network with R. Akhavan's brother, A. AKHAVAN. In or about October 2024, MIZRACHI took over sole responsibility for running the WebOps network.

l.  <u>A. AKHAVAN</u>: In addition to being R. Akhavan's brother, between or about 2016 and 2021, A. AKHAVAN was the Director of Marketing, and together with MIZRACHI, managed the WebOps network.

m.  <u>MOURID</u>: MOURID was the Head of IT Services within the WebOps network. As a technical controller, MOURID allocated the URLs for the fictitious merchants and created the content and design of their webpages.

n.  CRUZ:  CRUZ was the Chief Procurement Officer of the WebOps network, making the purchases necessary to maintain the network and overseeing the entire procurement process.

o.  BENAK:  BENAK was the Head of the Reconciliation Department, handling the accounting and reconciliation of accounts for the whole WebOps network.

### Summary of Victim Testimony

p.  Given the enormous number of victims whose debit or credit cards were fraudulently charged by the WebOps network, Germany has provided summaries of statements from a sampling of victims from across Europe.  Specifically, during their investigation, authorities interviewed approximately 112 witnesses from Germany.  All these witnesses stated that they had never subscribed to the WebOps websites and had not used the services of the websites they had been given.

q.  German authorities also interviewed over 200 witnesses from Croatia, the Czech Republic, Estonia, Greece, Latvia, Poland and Sweden.  Almost all the witnesses agreed that they had not subscribed to the adult entertainment websites for which they were charged. They confirmed to German authorities that they did not want or willfully authorize the debits from their credit cards.  The breakdown of those witnesses follows:

i.  Estonia:  Sixteen witnesses stated that they had never used their credit cards to subscribe to the websites in question, nor had they used the services of the websites.  Of these, approximately 31 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and/or gambling sites and had only wanted to subscribe there, not to the

websites in question. Seven of the 16 witnesses said they noticed some or all the debits, and nine witnesses did not notice the debits.

   ii. Greece: Eight witnesses stated that they have never visited nor subscribed to the websites that charged their cards. Of these, approximately 29 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and had only wanted to subscribe there – but not on the websites that were being held. Only one of the witnesses interviewed noticed the debit on his credit card.

   iii. Croatia: Twenty-two witnesses stated that they had never subscribed to websites with their credit cards or used the services of the websites about which they were asked. Of these, approximately 47 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites but did not enter their information on the WebOps' websites. Seven of the 16 witnesses stated that they noticed all or part of the debits, while nine witnesses did not notice the debits.

   iv. Latvia: Thirty-six witnesses stated that they had not used nor subscribed to any of the websites using their credit cards. Of these, approximately 33 percent of the witnesses had previously knowingly and intentionally entered their credit card data on other dating and/or erotic and/or gaming and/or sweepstakes sites but not on the internet sites that were the subject of Germany's investigation. Three quarters of the witnesses stated that they noticed all or part of the debits, while the rest did not.

   v. Poland: Forty-two witnesses stated that they had never subscribed to the websites with their credit cards and had not used the services of the websites. Of these, approximately 29

percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites but did not knowingly or intentionally enter such information on the websites in question. Only 10 of the 43 witnesses stated that they noticed some or all of the debits, and 32 witnesses had not noticed the debits at all.

      vi. Czech Republic: Of the fifty-seven witnesses, approximately 96.5 percent said that they never used their credit cards to subscribe to the websites or otherwise used the services of the websites. Of these, approximately 61 percent of the witnesses testified that they did not enter their credit card on the websites with which they were presented, but they acknowledged that they had registered or otherwise entered their credit card data on other dating or erotic websites, as well as on gaming, betting, sweepstakes, verification or ordering websites for computer software. Only 27 witnesses said that they noticed some or all of the debits, and 30 witnesses had not noticed the debits.

      vii. Sweden: Twenty witnesses stated that they had not used the services of the websites they had been given nor entered their credit card information on the websites. Of these, approximately 55 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and/or investment sites but not on the websites in question. Only two of the 20 witnesses stated that they noticed all or part of the debits, and 18 witnesses had not noticed any of the debits.

7. That in addition to the facts outlined above, Germany's request presents the following facts, among others, related to MOURID's specific involvement in the criminal scheme and commission of the above-referenced offense:

a. MOURID is the Head of IT Services within the WebOps network. Witnesses who testified in R. Akhavan and Weigand's trial in the Southern District of New York described MOURID's role as follows:

    i. "My understanding is that he was the representative of the company, and he would help with like technical issues as far as pertained to the processing."

    ii. "I believe he was in -- responsible for the technical aspects of their business."

    iii. "Medhat worked with Ray [presumably R. Akhavan]. He was his technical lead."

b. MOURID is a technical controller responsible for creating the content design and orientation of the webpages operated by the fictitious merchants. He allocated URLs needed by the WebOps network. For example, in an e-mail that CRUZ sent on or about November 11, 2014, she assured an employee of the German payment services provider Wirecard that "Medhat [MOURID] will have those urls completed by the end of the week for" three merchants that appear to be fictitious.

c. MOURID was responsible for the maintenance of the websites, such as updating the imprints (legal information on the website) and descriptors (text that appears on the credit card holders' bank or credit statements after purchase). He also ensured that the information customers see about the fictitious website and the payment correlates with information shared with German payment service providers to minimize the risk that the fraud scheme is detected. For example, on or about October 11, 2017, Weigand sent an e-mail to MOURID informing him that "the imprints are missing on the

13

following sites," "test logins do not work," and "payment pages do not feature descriptor and merchant location," and asking that he "please update as well."

    d.    In addition, MOURID managed complaints received by the German payment service processors to minimize the risk of detection. He also served as the point of contact between the German payment service process and the fictitious websites. These technical connections MOURID managed allowed money to move from the customers to the fictitious merchants. His role in this regard is evidenced by the following examples:

    i.    In an e-mail from Weigand to a German-based payment service provider, dated on or about October 11, 2019, Weigand stated that "Medhat [MOURID] is handling the technical integration for WebOps' merchants and has an issue where recurring transactions fail. As he is using the same flow over all channels and has successful recurrings as well. We would need to figure out as quickly as possible what need {sic] need to be adapted or is wrong here."

    ii.    In an e-mail sent to a Wirecard employee on or about March 28, 2019, MOURID wrote, "[T]hanks for the heads up. Traffic was already lowered on [a fictitious merchant] at the start of the month, should be ok going forward."

    iii.    In an e-mail to MOURID, Weigand, and another individual on or about February 22, 2018, MIZRACHI explained that a payment service provider would be "boarding a bunch of new low risk this month and we should have some capacity in the millions in the next month or so. [¶] In the meantime they have asked us to increase our volume by another 100K/month. Can you fill that?" MOURID

14

responded by e-mail and stated that "[t]he accounts through wirecard were turned live yesterday. So, we should see an increased volume, and we'll try to target $200k/month."

  e. Information found on an electronic device that was seized from Weigand and searched in connection with his 2020 prosecution revealed that MOURID also controlled the "traffic," i.e., the number of users on a website at any given time. For example, on or about April 11, 2016, Weigand sent an e-mail to MOURID asking that he "please add these MIDs to processing? I need some traffic there to get the 15 approved."[5] MOURID responded by assuring Weigand that "I have already added the mids in my system. Traffic should probably start by Wednesday or so."

  f. Communications between MOURID and Weigand reveal that MOURID was significantly involved in the execution of fictitious transactions that were intended to reduce the chargeback rate (the rate at which the merchant is returning payments to customers), thus preventing Visa and Mastercard from discovering the network's fraud. For example, in an e-mail to Weigand, dated on or about March 16, 2016, MOURID wrote:

> Like we do with all of our banks that we have volume with. We actually show them the processing sites, and the actual join forms. There isn't a single bank right now who is taking a big portion of our volume that is not aware of this. If the bank has any intelligence at all, they can see the transaction patterns don't match what we submit on the apps. So, you either hope you're dealing with an incompetent bank, or that u will be found sooner or later. And no matter how incompetent they are, at some point they will get a letter from Visa saying, we did this transaction on this website and it was processed at your institution on

---

[5] "MIDS" and "mids" appear to be abbreviations for "Merchant Identification Numbers," which payment service providers require to process payments. The WebOps Members often used these abbreviations as synonyms for fictitious websites.

this mid. I would rather the bank know this from us, not from visa.

In addition, MOURID supplied information on aggrieved parties and the fictitious subscriptions to Weigand.

8. That U.S. law enforcement believes that MOURID may be found within the jurisdiction of this Court. According to the United States Marshals Service:

a. California Department of Motor Vehicles ("DMV") records reveal that, on or about January 18, 2024, the DMV issued a California driver's license (No. ****0275) to "Medhat Sobhy Mourid," which lists his date of birth (**/**/1975), and an address in Woodland Hills, California. That date of birth corresponds with the date of birth the German authorities provided for MOURID. Further, the man depicted in the driver's license photograph, taken on or about January 18, 2024, appears to be the same person depicted in a photograph of MOURID that German authorities provided to the United States.

b. Law enforcement records also reveal that on or about December 2, 2024, MOURID, using a U.S. passport (No. *****0191), arrived in Los Angeles, California, by air from Lima, Peru.

9. That the Government of Germany has represented that it will submit a formal request for extradition supported by the documents specified in the Extradition Treaty, within the time required under the Extradition Treaty.

10. That MOURID would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREUPON, complainant respectfully requests that a warrant for MOURID's arrest be issued, based on probable cause, pursuant to Title 18, United States Code, Section 3184, and the extradition treaty between the United States and Germany, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

DATED: This 29th day of October, 2025, at Los Angeles, California.

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

_____
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Complainant
UNITED STATES OF AMERICA

Subscribed and sworn to by the applicant on this 29th day of October, 2025.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE