1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

10

# CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MEDHAT MOURID, <br><br> A Fugitive from the Government of the Federal Republic of Germany. | Case No. 2:25-MJ-06754-DUTY-1 <br><br> **ORDER GRANTING UNITED STATES OF AMERICA'S REQUEST FOR DETENTION (ECF No. 14)** |

## I.    INTRODUCTION

On October 29, 2925, the United States, fulfilling its obligations to the Government of the Federal Republic of Germany (alternatively, "Germany") pursuant to the Extradition Treaty Between the Government of the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20, 1978, T.I.A.S. No. 9785, as amended by the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987), as amended by the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal

1  Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S.

2  Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty"), filed a Complaint for

3  Provisional Arrest with a View Towards Extradition Warrant ("Complaint" or

4  "Comp.," ECF No. 1) against Medhat Mourid ("Mourid").  (*See generally* Compl.)

5  The Government seeks pre-extradition detention.  (ECF No. 14.)

6         As detailed below, the matter is fully briefed.  Finding that it needs no

7  further information from the parties, and upon the multiple requests by Mourid to

8  advance the Court's resolution of the Government's detention request, the Court

9  takes the matter under submission, **VACATES** the January 27, 2026 further

10 detention hearing, and hereby **GRANTS** the Government's detention request.

11

12 **II.    BACKGROUND**

13      **A.    The Complaint**

14        Mourid currently faces criminal charges emanating from Germany for the

15 violation of German Criminal Code section 129, paragraphs 1 and 5, and section

16 129(b), paragraph 1, Formation of a Criminal Organization Abroad.  (Compl. ¶ 2.)

17 Specifically, Germany is prosecuting a global criminal organization which, through

18 separate but related networks, falsified subscriptions to online "services" that were

19 not provided, fraudulently charged debit and credit cards for those nonexistent

20 services through German payment service providers, and distributed the wrongly

21 charged money to the participants in the global criminal organization.  (*Id.* at

22 ¶ 6(a).)  The networks, including the WebOps network in which Mourid is accused

23 of participating, allegedly created shell companies that purportedly operated

24 fictitious pornographic Internet websites and fraudulently registered those

25 companies with German payment service providers to facilitate financial

26 transactions between unsuspecting victims and the criminal organization.  (*See*

27 *generally* Compl.)  According to the German authorities, Mourid was the Head of

28 IT Services within the WebOps network and the technical controller responsible

2

for creating the content design and orientation of the webpages operated by the
fictious merchants and, pursuant to this role, maintained the websites, managed
complaints from the German payment service processors, controlled the traffic on
the websites, and was significantly involved in the fictitious transactions intended
to prevent Visa and Mastercard from discovering the network's fraud.  (*Id.* at ¶ 7.)

### B.    Procedural Background

On October 29, 2025, the Honorable Steve Kim, United States Magistrate
Judge for the Central District of California, issued a warrant for Mourid's arrest
based upon the Complaint.  (ECF No. 2.)  On November 4, 2025, upon his arrest,
Mourid was detained at the Los Angeles Metropolitan Detention Center ("MDC-
LA").  On that same day, Mourid made his initial appearance on the Complaint.
(ECF No. 8.)  At Mourid's initial appearance, the United States ("alternatively, the
"Government") orally requested detention pending extradition and subsequently
filed a formal Request for Detention Pending Extradition.  (ECF Nos. 8, 14.)  The
original Pretrial Services Report of November 4, 2025 ("OPTS Report"[1]) provides
a number of relevant facts but makes no recommendation.   The undersigned
Magistrate Judge temporarily detained Mourid, continued the detention hearing to
November 10, 2025, and ordered pre-hearing briefing.  (ECF No. 8.)

On November 6, 2025, Mourid filed a brief opposing his continued detention
("Opposition").  (Opp'n, ECF No. 12.)  Through the Opposition, Mourid contends
he is not a flight risk and that "special circumstances"—specifically, financial and
caretaking hardship to his family (his partner Ms. Jennifer Rosenblatt, their minor
///

---

[1] The Court recognizes that the OPTS Report is not made a part of the Court's
docket pursuant to 18 U.S.C. § 3153(c)(1); C.D. Cal. L. Cr. R. 49.1-2(2).  However,
the parties received a copy of the OPTS Report in advance of the detention hearing.
The Court retains a copy of the OPTS Report in its files and will make it available
for review upon request of a reviewing court.

daughter E█████,[2] and his elderly mother)—warrant his release on bail and under conditions of supervision.  (*See generally id.*)  In support of his Opposition, Mourid filed a letter to the Court from Ms. Rosenblatt ("Rosenblatt Letter 1," ECF No. 12-1) and a letter to the Court from Mourid's neighbor of five years, Tina Li (ECF No. 12-2).

On November 7, 2025, the Government filed its reply in support of detention ("Reply").  (Reply, ECF No. 13.)  In its Reply, the Government argues that the Court should detain Mourid because (1) he fails to establish the special circumstances that would warrant his release on bail in that neither "hardship" nor Mourid's character constitute special circumstances, and (2) he poses a risk of flight.  (*See generally id.*)

Upon the parties' multiple requests, the Court further continued the November 10, 2025 detention hearing to December 12, 2025 and granted leave for supplemental briefing.  (*See* ECF Nos. 15–17.)

On November 28, 2025, Mourid filed his Supplemental Brief in Opposition to Government Request for Detention ("Supplemental Opposition").  (Supp'l Opp'n, ECF No. 19.)  Through the Supplemental Opposition, Mourid reiterates that special circumstances exist—specifically, his high probability of success against the German prosecution, the financial and caretaking hardship his absence would cause to Ms. Rosenblatt, E█████, and his mother, and his inability to properly manage his health condition while detained—which, together with evidence that he is not a risk of flight or danger to the community, warrant his release on bond and conditions.  (*See generally id.*)  In support of his Supplemental Opposition, Mourid filed a supplemental letter to the Court from Ms. Rosenblatt ("Rosenblatt Letter 2," ECF No. 19-1), family photographs ("Photos," ECF

---

[2] The Court redacts the name of Mourid's minor daughter in the interest of privacy. *See* Fed. R. Cr. P. 49.1(a)(3).

No. 19-2), four character letters ("Character Letters," ECF No. 19-3), a letter from
Gary Tanouye, M.D. ("Dr. Tanouye Letter," ECF No. 19-4), screenshots of
Mourid's stationary bicycle workouts ("Bike Evidence," ECF No. 19-5), a log of
Mourid's gym activity ("Gym Log," ECF No. 19-6), and a report related to his and
Ms. Rosenblatt's property ownerships ("Property Report") (ECF No. 19-7).

On December 5, 2025, the Government filed its Supplemental Reply in
Support of Detention ("Supplemental Reply"). (Supp'l Reply, ECF No. 21.)
Through the Supplemental Reply, the Government argues that Mourid does not
demonstrate a substantial likelihood of success in the German prosecution, that
neither his claimed financial and caretaking hardships nor his health constitute
special circumstances, and that he continues to be a flight risk. (*See generally id.*)

On December 12, 2026, the parties appeared again for a detention hearing
and the Court heard argument from counsel. (ECF No. 23; *see also* "Transcript,"
ECF No. 28.) The supplemental Pretrial Services Report of December 12, 2025
("SPTS Report"[3]) provides a number of relevant facts, makes no recommendation
regarding a finding of special circumstances, but recommends release on bond and
conditions should the Court find special circumstances and no risk of flight.

Upon Mourid's request during the detention hearing to file supplemental
briefing regarding his finances in support of his special circumstances argument,
the Court further continued the detention hearing to January 27, 2026 and granted
leave for Mourid to file such a brief. (*Id.*) On December 16, 2025, Mourid filed a
Notice Regarding Supplemental Briefing through which he advised the Court that
he declined to supply further financial information and asked the Court to either

---

[3] As with the OPTS Report, the SPTS Report is not made a part of the Court's
docket pursuant to 18 U.S.C. § 3153(c)(1); C.D. Cal. L. Cr. R. 49.1-2(2). However,
the parties received a copy of the SPTS Report in advance of the detention hearing.
The Court retains a copy of the SPTS Report in its files and will make it available
for review upon request of a reviewing court.

issue its ruling detaining or releasing Mourid forthwith or advance the January 27, 2026 further detention hearing. ("Financial Brief," ECF No. 22).

On December 16, 2025, the Court issued an Order Regarding Detention Determination through which it ordered Mourid to answer a series of questions regarding the caretaking of E███ during his detention.  (*See* ECF No. 25.)  In response, on December 19, 2025, Mourid filed his Response to Minute Order through which he answered the Court's questions and reiterated his request that the Court either issue its ruling detaining or releasing Mourid forthwith or advance the January 27, 2026 further detention hearing.  ("Caretaking Brief," ECF No. 27.)  In support of the Caretaking Brief, Mourid filed a Declaration of Medhat Mourid ("Mourid Declaration").  (Mourid Decl., ECF No. 27-1.)

On January 7, 2026, the Court issued a second Order Regarding Detention Determination through which it ordered Mourid to provide updated information regarding his health care at MDC-LA and the Government to respond to Mourid's update.  (ECF No. 31.)  On January 9, 2026, Mourid filed his response through which he provided the requested health care update and reiterated his request that the Court either issue its ruling detaining or releasing Mourid forthwith or advance the January 27, 2026 further detention hearing to January 16, 2026 or January 20, 2026.  ("Health Brief," ECF No. 32).  On January 13, 2026, the Court denied Mourid's requests.  (ECF No. 34.)  On January 16, 2026, the Government filed its response to Mourid's Health Brief.  ("Health Response Brief," ECF No. 35.)  In addition to responding to Mourid's health care assertions, the Government noted that it would provide even further updated information through the January 27, 2026 detention hearing and would make available a representative from MDC-LA at the detention hearing to answer any questions the Court may have related to Mourid's detention.  (*Id.*)  In support of its Health Response Brief, the Government filed the Bureau of Prison's High Rise Menus for the first five weeks of 2026

///

("Menus," ECF No. 35-1) and the Bureau of Prison's Food Service Manual ("Manual," ECF No. 35-2).

## III.   PERTINENT LAW

The Bail Reform Act of 1994 and the corresponding bail standards governing federal criminal cases do not apply to international extradition cases. *See Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (different standards exist for granting bail in extradition cases and federal criminal cases), *cert. denied*, 469 U.S. 817 (1984).  Instead, there is a presumption against bail in extradition cases and release on bail is not appropriate absent a showing of "special circumstances" by the party seeking release.  *Kamrin v. United States*, 725 F.2d 1225, 63 (1903); *In re* Requested *Extradition of Kirby*  ("*Kirby*"), 106 F.3d 855, 858 (9th Cir. 1996) (as amended Feb. 27, 1997); *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *In re Extradition of Santos* ("*Santos*"), 473 F. Supp. 2d 1030, 1035 (C.D. Cal. 2006).

"The rationale for distinguishing pretrial release in extradition cases from federal criminal cases is that extradition cases involve an overriding national interest in complying with treaty obligations."  *In re Extradition of Molnar* ("*Molnar*"), 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002); *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990).  The interest in producing extraditable persons "is magnified where a defendant is charged with acts of terrorism."  *United States v. Leitner*, 784 F.2d 159, 161 (2d Cir. 1986) (per curiam).  "If the United States were to release a foreign fugitive pending extradition and the defendant absconded, the resulting diplomatic embarrassment would have an effect on foreign relations and the ability of the United States to obtain extradition of its fugitives."  *Molnar*, 182 F. Supp. 2d at 687; *Taitz*, 130 F.R.D. at 444.

In addition to "special circumstances," the party seeking release on bail in an international extradition case also must demonstrate that there is no risk he will fail

to appear for further extradition proceedings and that he is not a danger to the

community.  *Santos*, 473 F. Supp. 2d at 1035; *see also United States v. Kollmer*,

2019 U.S. Dist. LEXIS 83856, at *4–5 (N.D. Cal. May 17, 2019) (finding that

fugitive had "negate[d] the risk of flight" and that his release would pose "no risk

of flight or danger to the community"); *In re Extradition of Antonowicz*

("*Antonowicz*"), 244 F. Supp. 3d 1066, 1068 (C.D. Cal. 2017) ("once special

circumstances are shown, [the fugitive] must also demonstrate that he or she will

not flee or pose a danger to any other person or to the community" (alteration in

original)); *In re Extradition of Morales* ("*Morales*"), 906 F. Supp. 1368, 1377

(S.D. Cal. 1995) ("While there is a presumption against bail in foreign extradition

cases, a court may grant bail where special circumstances exist and where the

person facing extradition poses no risk of flight or danger."); *Taitz*, 130 F.R.D. at

447 ("While there is a presumption against bail, the law, however, does not

preclude a court from setting bail if there is no risk of flight and special

circumstances exist.") (emphasis added); *but see In re Manrique*, 445 F. Supp. 3d

421, 423 (N.D. Cal. 2020) (finding extraditee to be a flight risk and noting that risk

could not be completely mitigated, but granting bail where risk mitigated by

pandemic, bail conditions and bail package).

## IV.   DISCUSSION

Throughout his multiple briefs, Mourid advances two fundamental

arguments in support of his burden to defeat the presumption of detention:  (1) that

special circumstances justify his pre-extradition release, and (2) that he does not

pose a risk of flight.  (*See generally* Opp'n.)  The Court finds neither argument

persuasive.

///

///

///

8

### A.    Mourid's Burden

In extradition proceedings, the extraditee bears the burden of demonstrating that he is entitled to bail, *i.e.*, that there are special circumstances and that he is neither a flight risk nor a danger to the community. *Santos*, 473 F. Supp. 2d at 1035. Courts differ as to whether the extraditee must make such a showing by clear and convincing evidence or preponderance of the evidence. *See In re Extradition of Beresford-Redman* ("*Beresford-Redman*"), 753 F. Supp. 2d 1078, 1088 (C.D. Cal. 2010) (noting same and collecting cases); *compare In re Extradition of Mainero* ("*Mainero*"), 950 F. Supp. 290, 294 (S.D. Cal. 1996) *and In re Extradition of Nacif-Borge* ("*Nacif-Borge*"), 829 F. Supp. 1210, 1215 (D. Nev. 1993) (requiring clear and convincing evidence) *with Trinidad y Garcia v. Benov*, No. CV 08-07719 MMM (CWx), 2009 U.S. Dist. LEXIS 75455, *10 (C.D. Cal. Apr. 13, 2009) *and Santos*, 473 F. Supp. 2d at 1035 n.4 (requiring preponderance of the evidence).

Mourid argues that the appropriate burden at this stage of the proceedings is "preponderance of the evidence." (*See* Opp'n 3; Supp'l Opp'n 6–7.) The Government, on the other hand, argues that the appropriate standard is "clear and convincing evidence." (Supp'l Reply 9–10.) The Court need not resolve the issue here. To the extent it finds that Mourid has met his burden in certain respects, the Court concludes that he has satisfied the clear and convincing standard. To the extent it finds that Mourid has not met his burden in certain respects, the Court concludes that he has not satisfied the preponderance of the evidence standard.

### B.    Mourid Does Not Meet His Burden to Establish Special Circumstances

As Mourid concedes, he bears the burden of establishing that special circumstances exist. (Opp'n 3.)

///

1    The term "special circumstances" has never been precisely defined.  *Santos*,

2  473 F. Supp. 2d at 1036; *see Kirby*, 106 F.3d at 863 (noting that Supreme Court's

3  decision in *Wright v. Henkel*, 190 U.S. 40 (1903), "does not provide significant

4  guidance as to what 'circumstances' might be considered 'special'").  However, as

5  the term itself suggests, special circumstances do not encompass circumstances

6  faced by all those incarcerated.  *See In re Extradition of Smyth* ("*Smyth*"), 976 F.2d

7  1535, 1535–36 (9th Cir. 1992) (reversing grant of bail in extradition case as

8  circumstances identified were experienced by all incarcerated defendants).  This

9  "is a more demanding standard than that for ordinary accused criminals awaiting

10  trial." *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981).  It long has been

11  recognized that the special circumstances exception "should be exercised only in

12  the most pressing circumstances, and when the requirements of justice are

13  absolutely peremptory." *In re Mitchell* ("*Mitchell*"), 171 F. 289, 289 (S.D.N.Y.

14  1909).

15    Courts have addressed whether particular circumstances are sufficient to

16  overcome the strong presumption against bail in extradition cases on a case by case

17  basis. *Santos*, 473 F. Supp. 2d at 1036 (citations omitted).  While the list of

18  potential "special circumstances" is not limited to those previously recognized in

19  published decisions, and the determination of what constitutes a "special

20  circumstance" is left to the sound discretion of the judge (*id.*), a review of what

21  courts have, and have not, found to be special circumstances is nevertheless

22  instructive.

23    "Special circumstances" have been found in the following instances:  a high

24  probability of success, a serious deterioration of health while incarcerated, or

25  unusual delay (*see Salerno* 878 F.2d at 317 (citing cases)); combined factors of

26  lengthy extradition hearing, lack of prior record, allergic reaction to soap used in

27  laundered clothes at correctional facilities, and inability to carry out religious

28  rituals (*Taitz*, 130 F.R.D. at 446); promoting harmony between the supporters of

10

the cause of Catholics in Northern Ireland and those whose interests are otherwise
(*Kirby*, 106 F.3d at 865); the availability of bail for crime charged in the
demanding country (*Nacif-Borge*, 829 F. Supp. at 1221); the lack of a suitable
facility in which to detain a juvenile extraditee (*Hu Yau-Leung*, 649 F.2d at 920);
that the petitioner might lose "all [his] fortune" if not permitted to complete his
participation in a civil proceeding underway at the time of his arrest (*Mitchell*, 171
F. at 289–90).

A partial list of what has been rejected as "special circumstances" includes:
the normal passage of time inherent in the litigation process (*United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996)); the discomfiture of jail and "applicant's
arguable acceptability as a tolerable bail risk" (*United States v. Williams*, 611 F.2d
914, 915 (1st Cir. 1979)); the availability of electronic monitoring and home
detention to decrease flight risk (*In re Extradition of Rovelli* ("*Rovelli*"), 977 F.
Supp. 566, 569 (D. Conn. 1997)); and the fact that the extraditee's family depends
on him for financial support (*In re Extradition of Russell* ("*Russell*"), 805 F.2d
1215, 1217 (5th Cir. 1986)).

Here, Mourid asserts a number of factors that he claims establish special
circumstances in his case. (*See generally* Opp'n; *see generally* Supp'l Opp'n.)
Each is addressed below.

### 1.    The financial burden on Mourid's family

Mourid argues that the financial burden on his family created by his
detention constitutes a special circumstance weighing in favor of his release. He
contends that Ms. Rosenblatt and E███ "rely primarily and exhaustively on his
income . . . to live." (Opp'n 4.) He avers that, as "the primary breadwinner and
source of almost all financial support in his family," he is responsible for the house
and bills. (*Id.* at 2; *see also* Supp'l Opp'n 8.) He explains that Ms. Rosenblatt's
$55,000 annual earnings as an accountant are not, and never have been, sufficient

1   to pay their family's living expenses.  (*See* Opp'n at 4; *see also* OPTS 3 (noting

2   that Ms. Rosenblatt earns $55,000 annually).)  He asserts that "[w]ithout his

3   income, his family will face delinquency in mortgage payments, possible

4   foreclosure, and eviction" and "will be forced into dire straits."  (Opp'n at 2, 4.)

5           As a starting point, the Court agrees with the Government that Mourid's

6   claim that his family will face financial "dire straits" without his ongoing $180,000

7   per year income stream is largely exaggerated.  (*See* Reply, 6; OPTS Report 3

8   (noting that Mourid earns $180,000 annually).)  According to the OPTS Report,

9   Mourid reported that his monthly expenditures—presumably to maintain his

10  family's lifestyle—total $10,000.  (*See* OPTS Report 3.)  But the OPTS Report

11  also reveals that Mourid has substantial assets that could be used to sustain his

12  family during his detention even without his monthly earnings contributions:  he

13  has checking and savings accounts that presently boast a balance of $300,000 and

14  $400,000; he owns three vehicles valued at $45,000; his retirement account holds

15  $500,000 in assets; the equity in his residential home reaches $1.2 million; and the

16  equity in his investment rental property reaches $500,000.  (*See id.*)  The OPTS

17  Report also reveals that Ms. Rosenblatt herself is the owner of residential rental

18  property in California valued at $800,000 with a mortgage balance of $40,000.

19  (*See id.*)  In addition, the SPTS Report clarified that Mourid owns two properties,

20  one with $1,050,000 in equity and the other with $630,000 inequity; that Ms.

21  Rosenblatt owns two properties, one with $715,000 in equity and that other paid in

22  full and valued at $800,000 (which she currently owns with her ex-husband but

23  over which he has no financial interest and full title is being transferred to herself

24  alone).  (*See* SPTS Report 2–3.)

25          With these assets at the family's disposal, the Court was perplexed about

26  Mourid's "dire straits" argument.  As such, at the detention hearing, the Court

27  posed a series of questions regarding the family's financial circumstances, only

28  some of which Mourid answered with any level of certainty.  Mourid was able to

state with certainty that Ms. Rosenblatt's net income from her employment is $3,900 per month (Transcript 18); that she receives $2,200 per month in net income from the properties she and her brother own (*id.*); and that the family would be unable to meet its usual monthly expenses without drawing on Mourid's and Ms. Rosenblatt's savings and 401(k) accounts, the balance of which was unknown to Mourid (*id.* at 21–22).  In that Mourid was unable to answer the remainder of the Court's questions, he requested an opportunity to submit to the Court a separate brief answering the financial information posed by the Court—specifically, a financial statement and information regarding the family's savings, its income from rental properties and Ms. Rosenblatt's job, lines of credit on the properties owned by Mourid and Ms. Rosenblatt and, if no lines of credit presently exist, the possibility of obtaining such lines of credit, any family assets that are or could be made liquid, and the balance on Ms. Rosenblatt's 401(k) account.  (*Id.* at 23–25.)

On December 16, 2025, Mourid submitted his Financial Brief.  Through this filing, Mourid advised the Court that he declined to provide the financial information requested by the Court:

> After further consideration, Mr. Mourid has decided against filing further briefing concerning his and Ms. Rosenblatt's financial situation.  Instead, Mr. Mourid submits on the papers previously filed regarding the existence of special circumstances.

(Financial Brief 3.)

Left with nothing more than Mourid's original contentions and the information contained in the OPTS and SPTS Reports, the Court can only conclude that Mourid's claim of impending financial doom defies logic.  Indeed, it makes no mathematical—let alone common—sense that the quantum of joint assets held by the family and rental income stream generated by the family's multiple properties, combined with Ms. Rosenblatt's ongoing $55,000 in annual earnings, would be

insufficient to sustain the family's $10,000 monthly expenses during Mourid's detention.  To be sure, the equity in the four properties alone, totaling $3,195,000, is sufficient to cover the family's $10,000 monthly expenses for almost 27 years ($3,195,000 divided by $10,000 per month divided by 12 months per year)—a 2.7 multiple of the possible 10-year sentence should Mourid be convicted (Opp'n 8). Ultimately, Mourid had to so concede.  At the detention hearing, he noted:  "We're not in dire — they're not going to starve, Your Honor.  I don't know.  But I am the primary breadwinner for the household, no one's going to starve."  (Transcript 19.) When asked pointedly:  "[I]s your family going to be in dire straits?" Mourid responded:  "Not at all, Your Honor."  (*Id.* at 20–21.)  The Court need not belabor this point.  Mourid's claim that his family will suffer a financial burden in his absence lacks evidentiary support.

Moreover, even if the Court were to believe the financial burden Mourid predicts— which it does not—the law is clear that a family's dependence on the extraditee's financial support does not constitute "special circumstances" warranting release.  *See, e.g., Russell,* 805 F.2d at 1217; *In re Extradition of Drumm* ("*Drumm*"), 150 F. Supp. 3d 92, 99 (D. Mass. 2015) (the possibility of financial strain, "however unfortunate, is present in almost every case where a defendant with family faces detention pending adjudication" and thus "is not a special circumstance weighing in favor of release"); *Antonowicz*, 244 F. Supp. 3d at 1072 ("The Court does not intend to understate the financial and emotional burdens that detention causes, but those burdens are 'present in almost all cases and therefore [do] not constitute a 'special circumstance.''" (internal citation omitted)); *Beresford-Redman*, 753 F. Supp. 2d at 1088 ("Emotional hardship for the family of a fugitive facing extradition is present in almost all cases and therefore [does] not constitute a special circumstance." (internal quotations omitted)); *United States v. Mahabir*, 858 F. Supp. 504, 508 (D. Md. 1994) ("A defendant's incarceration regularly creates difficulties for him and his family.").

2.     The caretaking burden on Mourid's family

Mourid argues that the caretaking burden on his family created by his
detention constitutes a special circumstance weighing in favor of his release.  (*See*
Opp'n 4–6; Supp'l Opp'n 8–9.)  He points to three persons in his family that
purportedly cannot be without his caretaking support:  Ms. Rosenblatt, E███, and
his mother.  The Court addresses each in turn.

a.     *Ms. Rosenblatt*

Mourid argues that, should he be detained, no one would be available to care
for Ms. Rosenblatt, who has a family history of early death and recently was
rushed to the emergency room for undiagnosed heart issues, "return[ing] home
with a careful eye to future emergencies."  (Opp'n 4.)  In support of Mourid's
argument, Ms. Rosenblatt tells the Court that Mourid is her partner in every sense,
that Mourid is her "planner and decision maker,"  that she is "lost without him,"
that she has "anxiety and high blood pressure," that Mourid is her "calm," that she
questions how she is "going to make it on [her] own," that after only a couple of
days without him, she feels "like [she's] on the verge of a breakdown," that this
situation "has broken [her]," that she "recently faced a heart-related emergency"
and is "so scared [her] heart can't handle this," and that she is "falling apart
internally." (Rosenblatt Letter 1 at 3.)  Ms. Rosenblatt also tells the Court that she
and E███ are struggling without Mourid and that "even [their] dog is miserable."
(Rosenblatt Letter 2 at 2.)

But these allegations of Ms. Rosenblatt's almost complete inability of self-
and family-care are unconvincing.  It is not credible that a 53-year old woman,
who successfully maintains a full-time job as an accountant at a local high school
(*see* OPTS Report 3; Rosenblatt Letter 2), would be unable to care for herself, her
daughter, and the family affairs.  Indeed, Ms. Rosenblatt describes her job as one
requiring financial skills and management responsibility:

> I manage the Student Store at the high school.  My responsibilities at the Student Store include issuing and replacing student IDs, usually about 5 per day, which are required for students to enter and leave campus; handling sales for events and clubs, including selling tickets/ merchandise at the Student Store during school hours; and managing webstore items.  I also perform accounting services for the high school, including assisting with depositing all checks and cash, paying, in a timely manner, all invoices for the Associated Student Body (ASB) and the Athletic department; preparing bank reconciliations; and advising on budgets and spending.

(*See* Rosenblatt Letter 2.)  These are not responsibilities entrusted to a person who is incapable of, or lacks the skills for, managing a household.  Indeed, at the detention hearing, Mourid stated that Ms. Rosenblatt is "a very capable woman," and "has been . . . taking care of [their] family for the last five weeks."  (Transcript 35.)  In addition, Mourid conceded that Ms. Rosenblatt's prediction of a nervous breakdown was not supported by medical evidence and was, instead, "Ms. Rosenblatt's self-diagnosis opinion."  (*Id.* at 36.)  Moreover, these allegations become even less credible given Mourid's assertions that Ms. Rosenblatt is sufficiently capable to of being be left alone in charge of E███.  (*See infra*.)

Equally unconvincing is the implication that Ms. Rosenblatt faces an imminent physical emergency related to her heart.  Indeed, neither Mourid nor Ms. Rosenblatt present any evidence that Ms. Rosenblatt suffers from a heart condition in the first instance.  Although Mourid characterizes Ms. Rosenblatt's recent emergency room visit as one for "heart issues," the evidence does not support this, with Mourid himself admitting that "[t]he doctors were unable to identify the cause."  (Opp'n 4.)

In the end, Mourid's claim that Ms. Rosenblatt will not be able to care for herself and the family in his absence lacks evidentiary support.

///

16

1

            b.     *E█████*

2        Mourid argues that, should he be detained, no one would be available to care

3 for E████ while Ms. Rosenblatt is at work—presumably during afterschool

4 hours—and that no one would be available, and no system is in place, to care for

5 E████ during school breaks or in case of emergencies, such as a medical

6 emergency with Ms. Rosenblatt.  (*See* Opp'n 4; Supp'l Opp'n 8–9.)  Ms.

7 Rosenblatt supports these allegations with her letters.  In her first letter, Ms.

8 Rosenblatt notes that Mourid is a "devoted," "connect[ed]," "commit[ed],"

9 "patient," and "respect[ed]" father who is actively involved in E████'s life,

10 including reading to her, teaching her chess, supporting extra-curricular programs

11 such as instruments and sports (including being her soccer coach for the past four

12 years), encouraging good nutritional habits, and playing games with her.  (*See*

13 Rosenblatt Letter 1 at 2.)  In her second letter, Ms. Rosenblatt notes that, because

14 Mourid works remotely from home, he is the primary caregiver for E████ during

15 the work week, and that E████ is struggling without Mourid.  (*See* Rosenblatt

16 Letter 2 at 2.)  Indeed, Ms. Rosenblatt details an incident where she had to take

17 E████ to work with her because E████ was too sick to stay in school, which, of

18 course was not an ideal situation, and "made Ms. Rosenblatt feel awful."  (*See id.*)

19        While Mourid's relationship with his daughter is laudable, the allegations of

20 the harm that will befall E████ in his absence appear wholly exaggerated.  When

21 asked if there was a reason "that Ms. Rosenblatt is unable to read to her child, to

22 play with her, to . . . handle the parenting," Mourid answered:  "Absolutely she

23 can, Your Honor."  (Transcript 27–28.)  When asked if there was "a reason that

24 Ms. Rosenblatt can't cook for her daughter," Mourid answered:  "Of course she

25 can, I mean, yes, it's possible, yes, Your Honor."  (Transcript 29.)  When asked to

26 answer pointed questions about Ms. Rosenblatt's caretaking of E████ under oath,

27 Mourid avowed:

28 *///*

17

1    Question 1:  I do not believe that Ms. Rosenblatt is an
2    unsuitable caregiver for our daughter.

3    Question 2:  I do not contend that my daughter's life
     would be in danger or otherwise jeopardized under the
4    care of Ms. Rosenblatt.

5    Question 3:  I do not contend that my daughter's well-
     being would be in danger or otherwise jeopardized under
6    the care of Ms. Rosenblatt.

7    Question 4:  I do not contend that my daughter would be
8    in danger of neglect under the care of Ms. Rosenblatt.

9    Question 5:  I do not contend that, if the Court were to
     continue detaining me and Ms. Rosenblatt were to suffer a
10   mental or physical breakdown of any kind, as she
     suggests in the Letters, my daughter would not be
11   properly cared for by my and/or Ms. Rosenblatt's friends
12   and families.

13   (Caretaking Brief 3; Mourid Decl.)

14       With this, the Court concludes that Mourid's allegations of harm to E████ as

15   a result of his detention are overstated and should be discounted as such.

16

17                   c.    *Mourid's Mother*

18       Finally, Mourid argues he is needed to care for his 85-year-old mother.

19   (Opp'n 2, 5.)  He notes that his mother, who lives alone, is fairly immobile, uses a

20   walker to get around the house, takes ten medications daily, gets exhausted easily,

21   regularly sees a doctor, and relies on him for assistance with her medical care,

22   including attending medical appointments and understanding her doctors.  (*See id.*

23   at 5–6.)  Mourid explains that Ms. Rosenblatt is unable to care for Mourid's

24   mother by herself.  (*See id.* at 5; *see also* Supp'l Opp'n 9.)  Ms. Rosenblatt

25   supports these allegations.  In her first letter to the Court, she notes that Mourid's

26   mother relies on Mourid to take her to doctor appointments and care for her

27   medication refills, that she speaks only Arabic (making communication difficult

28   ///

18

between her and Ms. Rosenblatt), that she truly needs Mourid's support, and that she will be lonely and heartbroken without him.  (Rosenblatt Letter 1 at 3.)

While, as with his daughter, Mourid's relationship with his mother is laudable, the allegations of the harm that will befall her in his absence appear equally exaggerated.  Although Mourid suggests that a "medical catastrophe" involving his mother is possible (*see* Opp'n 5), there is no evidence of such. Moreover, Mourid's evidence that his mother's needs cannot be adequately addressed by his brother is not credible.  When asked if there was "a reason that the brother [could not] help with the mother," Mourid answered:  "He has five pets at home . . . [t]hat he is not able to leave."  (Transcript 32.)  Mourid insisted that this was "the honest truth" even though, albeit to his own surprise, his brother was present at the detention hearing.  (*Id.*)  When asked if someone else could be brought in to take care of his mother, Mourid answered that the language (Arabic) was a problem, but conceded it was possible for a translator to accompany her to the doctor.  (*See id.* at 33.)

As with the allegations related to Ms. Rosenblatt and E██████, the Court is unconvinced of the harm Mourid predicts will come to pass for his mother in his absence.

\* \* \*

In sum, Mourid's predictions of the medical and personal "catastrophes" that will flow from his detention are overstatements, to say the least.  Still, even if the Court were to accept these predictions—which it does not—a family's dependence on the extraditee's caretaking support does not constitute "special circumstances" warranting release.  *See, e.g., In re Budrys*, No. 19 M 179, 2019 U.S. Dist. LEXIS 74437, at \*16 (N.D. Ill. May 2, 2019) (denying bail despite fact, among others, that the fugitive was the primary caretaker of his three young children while his wife pursued her education); *Russell,* 805 F.2d at 1217 ("emotional hardship" does not constitute special circumstances).   In addition, should Mourid's speculative

caretaking needs actually materialize as he predicts, he always has the ability to return to the Court for reconsideration of the detention decision based on changed circumstances.

### 3.    Mourid's high probability of success against the German prosecution

Mourid argues that special circumstances exist in that he anticipates a high probability of defeating the German prosecution for which his extradition is sought on two grounds: (1) "there is a significant question whether the German prosecution is time-barred," and (2) the German prosecution is based upon improperly-obtained evidence.  (Supp'l Opp'n 7–8.)

The Ninth Circuit recognizes that "the raising of substantial claims upon which the [fugitive] has a high probability of success" may constitute "special circumstances."  *Salerno*, 878 F.2d at 317.  However, as discussed below, Mourid does not meet the "high probability of success" standard here.

### a.    *Statute of limitations*

The parties agree that the applicable statute of limitations for the charged offense is five years, but disagree on the proper application of the statute under the circumstances here.  (*See* Supp'l Opp'n 7; Supp'l Reply 7–8.)  Mourid argues that the German case against him is based in part on evidence developed during the 2020 prosecutions of two persons charged with similar criminal conduct in the Southern District of New York and that any evidence therefore must have arisen, or become reasonably known, prior to that time, rendering the German May 13, 2025 arrest warrant untimely.  (Supp'l Opp'n 7–8.)   The Government responds that the statute begins to run upon completion of the last act, that the issuance of an arrest warrant interrupts and resets the limitations period, that the June 17, 2021 last act results in a statutory period through June 16, 2026, and that, in any event,

the German arrest warrant issued on May 13, 2025 interrupted the limitations period.  (Supp'l Reply 15.)

As a starting point, it is well-settled that a court should defer to a foreign government's interpretation of its own laws.  *See Grin v. Shine*, 187 U.S. 181, 190 (1902) ("It can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition].);  *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty 'and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.'") (citations omitted); *Noeller v. Wojdylo*, 992 F.3d 797, 805 (7th Cir. 2019) ("[E]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law."); *Skaftouros v. United States*, 667 F.3d 144, 156 (2d Cir. 2011) ("Any arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country.")

On this basis, the Court declines to step into the shoes of the German courts to unravel—let alone resolve—the dispute between the parties regarding the proper application of the German statute of limitations.  In that, under the governing framework, we are not invited to examine whether Germany has complied with its own laws, the Court rejects Mourid's statute of limitations argument as a basis for his purported high probability of success against the German prosecution.
\

### b.    *Evidence*

Mourid argues that the German prosecutor's receipt of evidence from the U.S. prosecution in the Southern District of New York violates the Mutual Legal Assistance Treaty ("MLAT"), thus raising a high probability of his success in defeating the German prosecution.  (*See* Supp'l Opp'n 8.)  Other than this bald,

21

conclusory assertion, Mourid does not set forth any legal argument as to this
contention. (*Id.*) The Government responds that it is unknown how the German
government obtained the evidence it intends to use against Mourid and that, in any
event, the MLAT does not create a right on the part of a private person to obtain,
suppress, or exclude any evidence. (*See* Supp'l Reply 16–17.)

The Court agrees with the Government that, regardless of the meaning of the
MLAT or the rights it affords extradition litigants like Mourid, it is not for this
Court to engage in an evaluation of the German evidentiary rules at the extradition
phase. (*Id.* at 17.)

* * *

In sum, Mourid's predictions of his ability to defeat the German prosecution
requires this Court to engage in an analysis of German law, which would require
the Court to overstep the bounds of comity, as detailed above. For this reason, the
Court finds that Mourid has not established "special circumstances" based on a
high probability of success against the German prosecution.

### 4.    Mourid's medical conditions

Mourid argues that his inability to effectively manage his pre-existing
medical conditions—high levels of LDL ("bad") cholesterol and low white blood
cell count—at MDC-LA puts his health at risk and, as such, constitutes a special
circumstance that warrants his release. (*See* Supp'l Opp'n 9–11.)

Special circumstances can include "a serious deterioration of health while
incarcerated." *Salerno*, 878 F.2d at 317. In *Taitz*, 130 F.R.D. at 447, the extraditee
suffered from allergic reactions to corn and corn sweeteners, which were common
substances in the food at the facility where he was being held. He also had an
allergic reaction to the soap that was used to wash the clothes at the facility. *See
id.* These were found to be special circumstances which, in combination with other
factors, warranted bail. *See id*. On the other hand, the extraditee in *Nacif-Borge*,

829 F. Supp. at 1217, had only one kidney, which required that he maintain a
special diet consisting of fruit, vegetables, and low fat.  He also had to avoid
certain foods and required daily exercise and sufficient liquids to maintain good
health.  *See id.*  As his condition was not debilitating and was easily controlled, the
court concluded that he had not "provided sufficient detail of his condition or
needs to convince this court by clear and convincing evidence that the severity of
his condition comprises a special circumstance warranting release on bail."  *Id*.
Finally, the extraditee in *In re Extradition of Rouvier* ("*Rouvier*"), 839 F. Supp.
537, 542, n.9 (N.D. Ill. 1993), who was diagnosed with a "potentially serious"
heart condition and had been treated by a physician with prescription medications,
did not show that his condition was serious enough to qualify as a special
circumstance as it had not deteriorated and could be controlled with medications
that were being provided in custody.

Here, Mourid contends that his detention will preclude him from following
the doctor-prescribed regimen of specific medications, specialized diet, and
cardiovascular exercise.  (*See* Supp'l Opp'n 11–14.)  In support of this contention,
Mourid presents a declaration from his treating physician of eight years, Dr.
Tanouye.  (*See* Dr. Tanouye Letter.)  In addition to explaining the contours of
Mourid's high cholesterol condition, Dr. Tanouye notes that he: (1) prescribed
Crestor (rather than Lipitor) and Zetia; (2) recommended that additional blood
work be done in February 2026; (3) recommended that Mourid begin taking
Repatha instead of Crestor and Zetia if his Lp(a) level has not dropped by February
2026; (4) recommended that Mourid follow a heart-healthy diet of lean protein,
fresh fruits, and vegetables; and (5) recommended that Mourid exercise regularly.
(*See id.* 2–3.)  In addition, Dr. Tanouye expressed concerns that living in a setting
like Mourid's current detention facility "necessarily exposes him to higher levels
of bacteria, viruses, fungi, and [p]arasites" rendering him "more susceptible to
infection because of his low white blood cell count."  (*Id.* at 3.)  Indeed, Mourid

presents evidence that his pre-detention exercise routine included riding his Peloton three times per week (*see* Bike Evidence) and going to his gym on 25 days during the period May 30, 2025 to October 21, 2025 (*see* Gym Log).

Through his Supplemental Opposition and at the detention hearing, Mourid argued that he has been, and will be in the future, unable to follow Dr. Tanouye's recommendations during his detention at MDC-LA and that he fears his health will deteriorate. (Supp'l Opp'n 11–14; Transcript 37–39.) Mourid noted that Crestor and Zetia are not available at MDC-LA, that he would be given Lipitor instead of Crestor, that there is no substitute for Zetia, and that Repatha will not be available should he need it commencing in February 2026. (*See* Supp'l Opp'n at 11–12.) Mourid also avers that his diet at MDC-LA "has been terrible and very high in carbohydrates and sugars" which "will be devastating to his medical condition." (*Id.* at 12–13.) Finally, Mourid contends that his exercise options "are very limited, and none meet his needs," noting that the facility "has two mechanical walkers (not even as good as a treadmill), but one is broken" and "[t]he other is often in use by someone else," that the "standard issue shoes and socks . . . cannot be used on the walker," and that even vigorous walking "does not raise his heart rate high enough to achieve any cardiovascular benefit." (*Id.* at 13.) Moreover, Mourid fears that his detention will preclude him from being considered for upcoming medical trials. (Transcript 40–41.)

At the detention hearing, the Government noted that it had reviewed Mourid's medical claims and reported as follows: (1) Zetia is available through the Bureau of Prisons; (2) Mourid can submit his medical records to the Bureau of Prisons if he would like them reviewed by the MDC-LA medical staff; (3) medication not presently (Repatha) prescribed will be considered at the appropriate time; (4) MDC-LA has a number of diets available, including a heart-healthy diet but that Mourid had not made a request for such; (5) there are work-out machines at MDC-LA, there is a common area and a deck with a basketball

court for exercise, and Mourid can run in place in his cell to increase his heart rate. (*Id.* at 46–51.)

In that the Government's information was, in part, new to Mourid, the Court determined that further action and investigation was needed by the parties before a determination could be made regarding whether Mourid's medical condition presents a special circumstance that warrants release.  Thus, the Court continued that decision until the January 27, 2026 detention hearing and made a recommendation to MDC-LA that Mourid be provided with a medical examination and/or treatment for his cholesterol and low white blood cell count by December 19, 2025.  (ECF No. 30.)

On January 7, 2026, the Court ordered the parties to provide a further update regarding Mourid's medical conditions, specifically detailing "(a) any failures of the Institution to provide adequate medication, diet, and exercise opportunities, and (b) any incidents or circumstances that have resulted in infections that were not properly treated by the Institution, both since the December 12, 2025 detention hearing."  (ECF No. 31.)  Mourid filed his Health Brief on January 12, 2026.  (*See* Health Brief.)  He contends that (1) he missed two days of Crestor and one day of Zetia while awaiting prescription refills; (2) he did not receive the court-recommended December 19, 2025 blood test until January 5, 2026; (3) he requested a a heart-healthy diet on five or six occasions but no such diet had been provided; (4) although he takes "a one-hour [exercise] class that includes push-ups, sit-ups, etc." and is allowed to walk in the deck area for forty-five minutes twice a day, he does not believe this has a sufficient cardiovascular benefit because he "cannot keep [his] heart rate up for an extended period of time"; and (5) he has not suffered from any infections that were not properly treated by MDC-LA.  (*See id.* at 4–8.)

The Government filed its Health Response Brief on January 16, 2026.  (*See* Health Response Brief.)  The Government explains that (1) MDC-LA was unable

to conduct the Court-recommended blood test until January 5, 2026 due to the holidays, the lack of a phlebotomist, a shortage of nurses, and the need to seek a local laboratory to analyze the blood; (2) Mourid's prescriptions for Crestor and Zetia have been re-filled and MDC-LA has received approval to prescribe Crestor through November 2026 and Zetia through January 2028; (3) MDC-LA could find no records regarding Mourid's request for a special diet, possibly due to the change in electronic mail distribution, but that the Food Service Administrator spoke with Mourid about his dietary needs on January 15, 2026, that his lunches and dinners already were based on the Bureau of Prison's heart-healthy menu, and that MDC-LA would make substitutions to Mourid's breakfasts to conform them as such; (4) Mourid can exercise on the deck area, there are no restrictions in that area preventing him from running, performing lunges, or engaging in other activities to increase his heart rate and cardiovascular health, or exercising in his cell; (5) MDC-LA has not received Mourid's medical records from Dr. Latouye; and (6) MDC-LA was not aware of any medical issues with Mourid until he submitted his brief with the Court.  (*See* Health Response Brief.)  In support of its assertions, the Government submitted copies of five weeks of the heart-healthy diet and the Food Service Manual.  (*See* Menus, Manual.)

Upon review of this extensive set of materials and testimony, the Court concludes that, other than an unacceptable delay in the ordered blood test, there is no evidence indicating that MDC-LA is unable to meet Mourid's medical needs, as he contends.  The Crestor and Zetia issue has been resolved favorably to Mourid through November 2026 and January 2028, respectively; the Repatha issue is premature until the results of his next cholesterol blood test indicate, if at all, that Repatha is warranted; the diet concerns have been resolved in that, with the exception of breakfasts, Mourid has been on a heart-healthy diet and his breakfasts would be conformed to such as of January 15, 2026; and the exercise issue appears to have been an exaggeration regarding Mourid's inability to exercise.  The Court

also concludes that there is no evidence indicating that Mourid's health has

deteriorated.  With this, the Court finds that Mourid has not presented sufficient

evidence that the severity of his medical condition, when treated by the Bureau of

Prisons, is a special circumstance warranting bail.

> 5.   Other factors

Mourid argues that his character, his ties to the community, the absence of a

criminal history, and Ms. Rosenblatt's trust in him—as demonstrated by her

willingness to act as a third-party custodian and "put up the property in which she

and her daughter reside for bond" in favor of his release—together constitute

special circumstances weighing in favor of his release.  (Opp'n 6.)  In support, he

points to his "decades-long" residence in the Los Angeles area without any prior

arrests (*id.* at 2) and the esteem in which many hold him.  Indeed, there is no dearth

of compliments for Mourid from his friends and family.  A neighbor of five years

characterizes Mourid as "a devoted and loving family man" who "leads a simple

life and takes care of many things around the house."  (Li Decl.)  Ms. Rosenblatt's

adult daughter describes Mourid as "one of the most kindhearted, dependable, and

hardworking individuals" she has ever met with "generosity and compassion [that]

extend deeply to [her], [her] family, and everyone in his life."  (Character Letters at

2.)  Ms. Rosenblatt's uncle depicts Mourid as "a man of exceptional integrity,

kindness, and dedication."  (*Id.* at 4.)  A concerned family member portrays

Mourid as "an amazing member of [their] family" who has never been known as

"anything other than nice and loving to everyone he meets."  (*Id.* at 6.)  A

coworker describes Mourid as "a reliable, respectful, and hardworking individual

who consistently contributed positively to [the] workplace."  (*Id.* at 8.)

But none of these factors, together or in combination, support a

determination of release.  *See, e.g., Nacif-Borge*, 829 F. Supp. at 1220 (finding that

eighty-five letters attesting to fugitive's character did not constitute special

circumstance justifying bail, and stating that "[m]ore often, the character and background of a person subject to extradition are considered in regard to risk of flight and danger to the community, rather than as a special circumstance"); *In re Extradition of Sidali* ("*Sidali*"), 868 F. Supp. 656, 658 (D.N.J. 1994) (rejecting "extraordinary character" based on employment, close family ties, lack of prior criminal record, and universal community respect as special circumstance); *Beresford-Redman*, 753 F. Supp. 2d at 1089–91 (denying bail, despite strong family and community ties, and finding that letters in support from friends, family, and business associates are not "special circumstance" justifying bail); *In re Azizi*, No. 5:14-xr-90282 PSG, 2014 U.S. Dist. LEXIS 65857, at *9 (N.D. Cal. May 13, 2014) (denying bail despite lack of criminal record, non-violent nature of alleged offenses, and strong ties to community); *In re Extradition of Sutton*, 898 F. Supp. 691, 696 (E.D. Mo. 1995) ("[A]n extradition fugitive's character and background . . . are not by themselves a special circumstance sufficient to require release on bail in an international extradition case.").

### 6.    Conclusion regarding special circumstances

As detailed above, Mourid fails to establish even one single factor that warrants a finding of "special circumstances" justifying his release.  Even considering his proffered circumstances collectively (*see, e.g., Wroclawski v. United States*, 634 F. Supp. 2d 1003, 1009 (D. Ariz. 2009) (finding special circumstances based on combination of factors); *Molnar*, 182 F. Supp. 2d at 689 (finding that circumstances presented collectively constituted "special circumstances" to overcome the presumption against bail, even though none individually did so)), Mourid still falls short of overcoming the strong presumption against bail.  It is the Court's conclusion that the factors advanced by Mourid are not of the type that legally qualify as "special circumstances" in the first instance, and this conclusion does not change when the factors are considered as a group.  In

sum, Mourid has not presented any recognizable special circumstances that persuade this Court to depart from accepted rule that bail does not lie for extradition proceedings.

### C.     Mourid Meets His Burden to Establish He Is Not a Risk of Flight.

In support of his argument that he is not a risk of flight, Mourid avers that he is a U.S. citizen and a 36-year resident of the Central District of California who has no criminal history or any failures to appear in court.  (Opp'n 6.)  He contends that the evidence shows he is not attempting to evade legal process—the conduct complained of stems from 2016 to 2021, but he never left his home during or after that time.  (*Id.* at 6–7.)  He points to his stable housing and employment, the essential role he plays in the lives of Ms. Rosenblatt, E███, and his mother (as detailed above), as further evidence that he does not pose a risk of non-appearance. (*Id.* at 7.)  Further, he contends that the potential sentence of ten years if convicted is not an incentive to flee because it is altogether possible that he may be proven innocent or "end up with far less time."  (*Id.* at 8.)  Finally, he notes that he "is entirely willing to submit to any and all conditions [of release] that would assure the court of his appearance" including home detention, a third-party custodian who has strong incentives to ensure his compliance, a property bond, an affidavit of surety, and any other condition deemed necessary by the Court.  (*Id.*)

While Mourid minimizes the potential sentence claiming that he likely will defeat it, the potential sentence remains, as he concedes, a significant ten years if convicted.  Further, he has considerable liquid means with access to substantial resources that could be liquidated and used for absconding, not only alone, but with his entire family, able to start a new life anywhere.  Still, the Court finds that the above combination of factors and a proper set of conditions support a finding that any risk of flight either is very low or could be mitigated.  Nevertheless, ///

because the Court is unable to find the "special circumstances" necessary to rebut the extradition presumption of detention, this finding is of no help to Mourid.

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

A.    The Government's request for detention is **GRANTED**;

B.    Mourid's request for release on bail is **DENIED**;

C.    Mourid shall remain in the custody of the United States Marshal pending further order of the Court;

D.    The parties shall confer and advise the Court as to their availability and preferred dates for a final extradition hearing, at such time as all the paperwork from Germany has been received and processed by the United States. The Court will then set a briefing schedule for extradition and set a final extradition hearing date.

DATED:  January 20, 2026

MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE